Filed 7/31/25  P. v. Weathers CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>WINONA MARIE WEATHERS,<br><br>    Defendant and Appellant. | F087858<br><br>(Super. Ct. No. CF91438575)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christina Hitomi Simpson and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

The instant appeal arises from the denial of appellant Winona Marie Weathers's petition for resentencing (Pen. Code,[1] § 1172.6), following an evidentiary hearing. In 1992, a jury convicted Weathers and codefendants Steven Lyle McGrew, Johnnie Eugene Bell, and John Michael Crisp of the first degree murder of William Paul McClelland (§ 187, count 1), the robbery of McClelland (§ 211/212.5, subd. (b), count 2), and assault with a firearm on M.A. (§ 245, subd. (a)(2), count 4). The jury also found true enhancements alleging counts 1 and 2 occurred while Weathers, Bell, and McGrew were armed with a firearm (§ 12022, subd. (a)(1)). Additionally, it found true a special circumstance allegation against all defendants, asserting that the murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17)). The trial court sentenced Weathers to a term of life without the possibility of parole plus four years.[2]

In 2019, Weathers filed a petition for resentencing under former section 1170.95, now section 1172.6.[3] Following proceedings not relevant here, the trial court held an evidentiary hearing on the petition. At the conclusion of the hearing, the court found Weathers ineligible for resentencing relief, concluding that she is guilty of murder under the amended sections 188 and 189 because she was a major participant in the robbery who acted with reckless indifference to human life.

On appeal, Weathers contends that the trial court's finding is not supported by substantial evidence. We disagree and affirm the order denying her petition.

---

[1] All undefined statutory citations are to the Penal Code unless otherwise indicated.

[2] Weathers's life without parole sentence was subsequently commuted to a term of 25 years to life.

[3] On June 30, 2022, the statute was renumbered as section 1172.6 without substantive changes. (See Stats. 2022, ch. 58, § 10, eff. June 30, 2022.) We refer to the statute by its current designation throughout the remainder of this opinion.

## STATEMENT OF FACTS

### *The Prosecution's Case*

By December 22, 1990, Paul McClelland owed Weathers a portion of a $750 loan she had provided to bail him out of jail. Weathers had grown desperate to recover the money, which she intended to use, in part, to pay for legal representation for her common-law husband, Eddie Weathers. Eddie Weathers was serving a prison sentence and had retained private appellate counsel. Weathers told her sister, A.Y., that she would get the money back "one way or another."

On the night of December 22, 1990, Weathers met with Bell, Crisp, and McGrew at the residence of their friend, K.M., where they formed a plan to collect the debt owed by McClelland. The group agreed to disguise the encounter as a drug transaction: Weathers would pose as a legitimate buyer by flashing cash, and the three men would accompany her. They also discussed who would take care of "the girl," presumably referring to McClelland's wife, T.M., who lived with McClelland. Weathers would recover either the money owed to her or its equivalent in other items, while Bell, Crisp, and McGrew would also receive something.

The group also discussed the fact that McClelland had a firearm. Following that conversation, Weathers and Bell were seen with a small silver handgun. Bell explained to his girlfriend, D.B., that the weapon was "just only for leverage, [and] that when you show a gun, it does the talking for you." Weathers also told D.B. that the gun "was just [for] leverage."

D.B. testified that before Weathers, Bell, McGrew, and Crisp left that night, Bell and McGrew changed their clothes.

On December 23, 1990, at approximately 2:00 a.m., the plan was set in motion. The group arrived at McClelland's condominium in Fresno. Using a key previously given to her by T.M., Weathers entered the condominium with Crisp. They found McClelland and T.M. inside the living room. Weathers told McClelland she had $3,000

3.

to purchase three ounces of crank, otherwise known as methamphetamine. McClelland made a phone call and left to retrieve the drugs. Crisp went outside shortly thereafter to retrieve a pack of cigarettes. He returned with Bell and McGrew.

As they waited for McClelland, Weathers rolled a marijuana cigarette and the group smoked it. T.M. got a "scary, uneasy feeling" from the men and how they presented themselves. When McClelland called the home telephone, T.M. told him to come home because she was scared. McClelland was however having trouble obtaining crank. McClelland telephoned T.M. a second time to let her know that he had found the drugs that Weathers had requested. McGrew, Bell, and Crisp said nothing while McClelland was gone.

Eventually, McClelland returned to the condominium with his brother-in-law, M.A. Bell, McGrew, Weathers, McClelland, and M.A. moved into the garage while T.M. and Crisp stayed in the living room. Either Bell or McGrew yelled at McClelland to "[g]et on [his] knees." Bell struck M.A. across the face with a chrome-plated handgun.

McClelland asked, "What's going on Nona?"[4] From the other room, T.M. heard Weathers yell, "This is because you owe me $1,500," followed by "Shoot him! Shoot him!"

Two gunshots rang out. McGrew had shot McClelland in the head.

T.M. ran into the garage to see McGrew standing over McClelland, who was lying on the floor. M.A. had blood all over his face. McGrew pointed a small brown revolver at T.M. As T.M. tried to run, she slipped and fell. Crisp grabbed T.M.'s arm and pulled her into the living room. He told T.M. that this had nothing to do with her, and that if she called the cops, they would return to kill her. T.M. noticed that the telephone cord to her house phone had been cut.

---

[4] Weathers was also known as "Nona."

As the group fled from the house, T.M. asked Weathers: "How could you come to my house and do this? How could you do this to me? You're supposed to be my best friend." Weathers threatened her "not to call the police or she'd come back and kill [her]." Weathers got into her car and drove away.

McClelland died the following morning. The forensic pathologist who conducted McClelland's autopsy opined that McClelland's head wound was consistent with a .22-caliber bullet. Gunshot residue on McClelland's skin suggested that the shot was fired at close range. John Hamman, a criminalist with the Department of Justice, opined that the absence of shell casings from the floor of McClelland's garage could be consistent with the use of a revolver.

The same day of the shooting, around 7:00 p.m., Weathers arrived at her sister, A.Y.'s home, and began moving her belongings into the driveway. A.Y. observed a white Camaro she had never seen before parked nearby.[5] A white male with dark hair, a mustache, and a beard was helping Weathers move her belongings. Weathers entered A.Y.'s house, while the man drove away. Weathers appeared to be jittery.

On December 24, 1990, the day after the killing, police arrived at A.Y.'s home and took Weathers into custody. When A.Y. looked inside Weathers's purse, she found .22-caliber cartridges inside of the change compartment of a wallet inside. An analyst for the Federal Bureau of Investigation opined that the elemental composition of the cartridges recovered from Weathers's purse was indistinguishable from that of bullet fragments recovered from McClelland's head.

A.Y. testified that Weathers had spoken about collecting a debt on December 22, 1990, so that she could help pay Eddie's lawyer and purchase some Christmas gifts. Weathers stated that she was going to get the money one way or another.

---

[5] Bell's girlfriend at the time of the incident, D.B., owned a white Camaro that Bell had borrowed.

A.Y.'s daughter, S.Y., also recalled Weathers saying that she kept a .22-caliber handgun under the driver's seat of her car. Weathers told S.Y. that she was collecting money loaned to get someone out of jail and needed the funds to pay Eddie's lawyer and for Christmas gifts. Weathers commented that if the money was not paid, the guy would be taken care of.

During an interview with investigators on December 25, 1990, S.Y. also reported that Weathers said, " 'I carry a gun inside [my] purse. They will pay.' " However, she denied making that statement during her trial testimony.

Weathers had a known fascination with firearms. She regularly carried a silver revolver and had been seen bringing several guns to a friend's house. Her collection included a .22-caliber chrome-plated handgun, one out of a matching set of .38- or .357-caliber Derringers, and both 12-gauge and .22-caliber rifles.

## The Defense's Case

### Trial Evidence

The defense argued that the killing occurred accidentally during a drug transaction that escalated into a struggle after McClelland unexpectedly pulled a gun.

McGrew testified that he had used a wide variety of drugs, including heroin, which was his drug of choice. He supported his habit by selling methamphetamine. During his testimony, McGrew admitted that he had suffered prior felony convictions for kidnapping, multiple sexual assaults, forgery, and marijuana possession. Although he had known Bell and Crisp for some time, McGrew had only just met Weathers the same month of the incident.

On December 22, 1990, McGrew and Bell pooled approximately $1,200 to $1,300 to purchase methamphetamine. After using drugs at K.M.'s home, Weathers suggested they obtain more methamphetamine in Fresno. After doing more drugs, McGrew and Bell drove to McClelland's condominium in one vehicle, while Weathers and Crisp drove in a separate vehicle.

Upon arriving at McClelland's condominium, Weathers and Crisp entered the residence first. McGrew and Bell stayed outside until Weathers confirmed it was safe. While McClelland was trying to obtain the drugs Weathers had requested, the group smoked marijuana. Eventually, McGrew expressed concern over McClelland's delay. T.M. made several phone calls and represented that McClelland was on his way back.

McClelland subsequently returned with M.A. McClelland took Weathers into the garage. About 10 to 15 minutes later, Weathers reported that McClelland was unwilling to allow McGrew to test the drugs. McGrew insisted he would not pay without sampling the product. Weathers suggested McGrew speak directly with McClelland. McGrew and Bell entered the garage while Weathers, Crisp, and T.M. remained in the living room.

In the garage, M.A. was seated at a table with a scale, a glass with a white powdery substance on it, and a pistol case. McClelland and McGrew argued over who would present their side of the transaction first. McGrew eventually told Bell to show McClelland the money. At that moment, McGrew saw a movement out of the corner of his eye. He heard McClelland say, " 'Fuck this,' " as McClelland reached behind his back and appeared to draw a gun.

McGrew grabbed for the gun and a struggle ensued. During the altercation, the gun discharged. At some point, a woman screamed, "Shoot 'em!" McGrew ultimately wrestled the gun away, but McClelland lunged toward it, prompting the gun to discharge again. McClelland fell to the ground. McGrew dropped the gun near McClelland, forced the garage door open by "rip[ing] the door off the wall," and fled.

As he ran, McGrew saw Weathers and T.M. outside by Weathers's car. Weathers asked what had happened, and T.M. stated that she would call 911. McGrew, Bell, and Crisp left in a Camaro. McGrew claimed he did not learn of McClelland's death until after he was arrested. He expressed remorse, stating that he never intended to kill McClelland and had no memory of pulling the trigger.

Dr. Warner Spitz, a forensic pathologist for the defense, testified that the gunshot wound to McClelland's head was a grazing wound caused by a .22-caliber bullet. He opined that the gun was fired from approximately one-and-a-half to five inches away. Dr. Spitz represented that it was not possible to determine the angle of the shot due to variability in head positioning. He further observed that blood spatter located 72 inches above the garage floor was consistent with McClelland having been standing when he was shot. However, on cross-examination, Dr. Spitz admitted he was not a blood spatter expert and had merely assumed that investigators had measured from the center of the blood concentration.

Neal Pedowitz, the attorney retained to represent Eddie Weathers on appeal, testified that on an unspecified date prior to the robbery, the balance of his fee had been paid by one of Weathers's friends. According to Pedowitz, the friend told Pedowitz he would give Pedowitz a Rolex watch as payment for his services.

### *Weathers's Testimony at the Section 1172.6 Evidentiary Hearing*

Although Weathers did not testify at her jury trial, she testified at the evidentiary hearing on her petition for resentencing. Weathers explained that on the night of the shooting, she went to McClelland's residence with McGrew, Bell, and Crisp to collect the money that McClelland owed to her. Weathers admitted that she had planned to commit a robbery with McGrew, Bell, and Crisp, but claimed that violence was not part of that plan.

Accompanied by Crisp, Weathers used a key given to her by T.M. to enter McClelland's condominium. Weathers asked McClelland to help her get some methamphetamine in exchange for settling his debt. McClelland agreed and left in search of drugs. Two or three hours later, McClelland returned with M.A. Weathers was skeptical that the substance McClelland brought back was methamphetamine.

While Weathers was smoking a joint with T.M., she heard a commotion coming from the garage. When she ran into the garage, she saw McClelland and McGrew

fighting. Weathers claimed that one of the men had a gun in his hand, and that she implored them to put the gun down. She ran when she heard the gun "popping."

At some point before she drove away, T.M. appeared at the door and shouted, "Noni, Paul has been shot." Weathers was shocked and in disbelief. She instructed T.M. to call 911 and almost got out of the car herself, but fear overtook her. After some car trouble, Weathers managed to start her vehicle, and she drove away.

The day after the shooting, Weathers was arrested while sleeping next to her children at her sister's house. A gun was pointed in her face. She did not have a firearm on her, although she admitted she might have had bullets in her possession due to past squirrel-hunting trips with her kids.

### *The Trial Court's Ruling on Weathers's Petition*

On March 15, 2024, the trial court issued a written ruling denying Weathers's petition for resentencing. The court explained that it had reviewed and considered Weathers's petition, the People's opposition, the transcripts from Weathers's trial, applicable case law, and the testimony presented at the evidentiary hearing. According to the court, the evidence demonstrated that Weathers was a major participant in the underlying felony who had acted with reckless indifference to human life. The court did not address the prosecutor's assertion that Weathers was also a direct aider and abettor who had personally harbored express malice.

During the evidentiary hearing, Weathers testified that she loaned $750 to T.M. to bail out McClelland and was never repaid. She stated that in December 1990, she and her codefendants went to T.M.'s home intending to take McClelland's methamphetamine to sell it, but she claimed there was no plan to use violence. According to Weathers, McGrew brought a gun for leverage during the robbery.

Weathers testified that she and Crisp entered T.M.'s condominium while Bell and McGrew waited in the car. McClelland allegedly agreed to sell methamphetamine and repay her from the proceeds. After McClelland returned several hours later, the men

9.

went into the garage while Weathers remained in the living room. She said she heard yelling and a struggle, saw McGrew and McClelland wrestling over a gun, and shouted for them to stop. She then heard gunshots, ducked, and fled to her car without seeing who was shot.

The court, having observed Weathers's demeanor and comparing her testimony to that of the trial witnesses', found her testimony not credible. Evidence showed that prior to the incident, Weathers had solicited her codefendants to help her collect the debt from McClelland "one way or another." Witnesses testified that she had a handgun just days before the killing and had expressed intentions to use force to collect the debt, if necessary. Testimony also showed that Weathers may have instructed McGrew to shoot McClelland and left the scene without rendering aid. According to the court, these facts demonstrated that Weathers had acted with reckless indifference to human life.

The court further found substantial evidence that Weathers had planned the robbery, that she had subsequently instructed McGrew to shoot McClelland, and that Weathers had either provided the firearm to McGrew or knew that McGrew was armed. The court concluded that these facts demonstrated that Weathers was a major participant in the robbery.

## DISCUSSION

### I. Substantial Evidence Supports the Trial Court's Conclusion That Weathers Is Guilty of Murder Under Amended Sections 188 and 189

Weathers contends there is insufficient evidence to support the trial court's conclusion that she is guilty of murder under amended sections 188 and 189. We disagree.

#### A. Standard of Review

When reviewing the denial of a petition for resentencing under section 1172.6 following an evidentiary hearing, we evaluate whether the trial court's findings are

10.

supported by substantial evidence. (*People v. Reyes* (2023) 14 Cal.5th 981, 988; *People v. Cooper* (2022) 77 Cal.App.5th 393, 412.)

The standard for assessing a sufficiency of the evidence claim is highly deferential. We examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence; that is, evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (See *People v. Cravens* (2012) 53 Cal.4th 500, 507; see also, *People v. Kurey* (2001) 88 Cal.App.4th 840, 848-849 [we "resolve all inferences and intendments in favor of the judgment," and "all conflicting evidence will be resolved in favor of the decision"].)

In conducting our review, we must presume in support of the judgment the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) We also accept all logical inferences the trial court could have drawn from circumstantial evidence. (*People v. Flores* (2020) 9 Cal.5th 371, 411.)

The question is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence supports the trial court's finding. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 139.) As such, a party challenging the sufficiency of the evidence bears a heavy burden. The judgment must be upheld unless it appears that, under no hypothesis whatsoever, is there sufficient substantial evidence to support it. (*People v. Cravens, supra*, 53 Cal.4th at p. 508; *People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

### B. Analysis

#### 1. Weathers Was a Direct Aider and Abettor Who Personally Harbored Express Malice

Although Senate Bill No. 1437 (Reg. Sess. 2017-2018) eliminated murder liability under the natural and probable consequences doctrine, a defendant who did not

personally kill may still be convicted of murder under a direct aiding and abetting theory. (See *People v. Reyes*, *supra*, 14 Cal.5th at p. 990; see also, *People v. Vargas* (2022) 84 Cal.App.5th 943, 953 [" '[o]ne who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law' "].)

Criminal liability extends not only to direct perpetrators but also to "[a]ll persons concerned in the commission of a crime," and all those who "aid and abet in its commission." (§ 31.) Guilt as an aider and abettor arises from the combination of the perpetrator's acts and the aider and abettor's own conduct and mental state. (*People v. Powell* (2021) 63 Cal.App.5th 689, 710.) Establishing aider and abettor liability thus requires proof of the following: "(a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

"[F]or a defendant to be liable for first degree murder as a direct aider and abettor, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating it's commission.' " (*In re Lopez* (2023) 14 Cal.5th 562, 587.) "An aider and abettor who knowingly and intentionally assists [another] to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder.' " (*Id*. at p. 579.) The prosecution must prove the accomplice had " 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*People*

*v. Gentile* (2020) 10 Cal.5th 830, 843, superseded by statute on other grounds as stated in *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 584.)

Applying those elements to the facts of this case, we conclude that there is substantial evidence demonstrating that Weathers was a direct perpetrator who personally harbored express malice. Weathers orchestrated the robbery, recruiting three male accomplices to accompany her to McClelland's condominium. Weathers also used a key to enter McClelland's condominium and was the first to enter.

Although the target offense was robbery, Weathers plainly foresaw and was prepared to employ violence, including deadly force, to ensure that the debt owed by McClelland would be repaid. The group discussed whether weapons would be present at McClelland's home and, in response, planned to bring their own, "for leverage." There was also strong evidence linking one of the guns used in the robbery—a chrome .22-caliber handgun—to a gun owned and regularly carried by Weathers, suggesting that she may have supplied the firearm. Furthermore, the bullets recovered from Weathers's purse matched those recovered from McClelland's head, supporting the inference that she not only supplied the firearm but also provided the ammunition.

S.Y. also told police that Weathers stated, "I carry a gun in [my] purse. They will pay." Although S.Y. denied at trial that Weathers had made this statement, we resolve all factual inferences in favor of the judgment on appeal. (See *People v. Kurey*, *supra*, 88 Cal.App.4th at pp. 848-849; see also, *People v. Barnes* (1986) 42 Cal.3d 284, 306 [" ' "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends" ' "].) To that end, although the evidence was contested, it was nonetheless sufficient to support the conclusion that Weathers was prepared and willing to use or facilitate the use of deadly force to recover the debt McClelland owed to her.

The most compelling evidence of all demonstrating that Weathers harbored express malice came from her own statements during the crime. As McClelland knelt with McGrew pointing a firearm at him, Weathers stated, "Fuck you, Paul, you owe me money. Shoot him, shoot him." or "This is because you owe me $1500. Shoot him! Shoot him!" From these statements, a trier of fact could reasonably conclude that Weathers encouraged McGrew to shoot McClelland, thus supporting the conclusion that she acted with express malice.

Weathers's actions after the shooting only reinforce this conclusion. Rather than reacting with shock or attempting to help McClelland, Weathers fled the scene without calling for help or notifying law enforcement. On her way out, she also threatened T.M. "not to call the cops or she'd come back and kill [her]." Weathers's apparent lack of surprise that McGrew had shot McClelland, combined with her failure to render aid, her decision not to report the crime, and her threat to kill T.M., supports the reasonable inference that she intended for McClelland's murder to occur.

In sum, the record shows that Weathers: (1) orchestrated and led an armed robbery, during which, she contemplated the use of weapons, and may have supplied one of the weapons and ammunition; (2) facilitated entry into McClelland's home; (3) explicitly instructed McGrew to shoot McClelland; and (4) following McGrew's execution-style shooting of McClelland, threatened to kill T.M. if T.M. called the police. This evidence establishes that Weathers directly aided and abetted McClelland's murder with express malice. Based upon the foregoing, we conclude that the trial court properly denied Weathers's petition for resentencing, finding her guilty of murder under amended sections 188 and 189.

Our conclusion resolves the primary issue of whether the trial court erred in denying Weathers's petition for resentencing. However, we address whether Weathers was a major participant who acted with reckless indifference to human life, as it has been

raised by the parties in their appellate briefs, and it remains relevant to the broader legal context of her culpability under the applicable statutes.

## 2. Major Participant/Reckless Indifference to Human Life

Under amended section 189, a person may be held liable for murder if they were a major participant in the underlying felony and acted with reckless indifference to human life.  (§ 189, subd. (e)(3).)  The requirements of being a major participant and acting with reckless indifference " 'significantly overlap … in general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' "  (*People v. Clark* (2016) 63 Cal.4th 522, 615 (*Clark*).)

### a.  *Major Participant*

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major" [citations].' "  (*Clark*, *supra*, 63 Cal.4th at p. 611.)  In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court identified the following considerations relevant to this determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?  No one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Id.* at p. 803, fn. omitted.)

Weathers does not contest the court's finding that she was a major participant in the robbery, but she does not expressly concede this point either.  The factors relevant to determining major participation and reckless indifference significantly overlap.  As such,

15.

we proceed directly to an analysis of whether she acted with reckless indifference to human life, which is the primary point of contention between the parties.

### b. *Reckless Indifference to Human Life*

In *Clark*, our Supreme Court addressed the element of "reckless indifference." (*Clark*, *supra*, 63 Cal.4th at pp. 614-623.) The court explained that reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Id*. at p. 616.) It encompasses "a willingness to kill (or to assist another in killing) to achieve a distinct aim," even if the defendant does not specifically desire death as the result of their actions. (*Id*. at p. 617).

Reckless indifference includes both subjective and objective components. Subjectively, the defendant must consciously disregard known risks. Objectively, the conduct involved constitutes " 'a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Clark, supra*, 63 Cal.4th at p. 617.) In *Clark*, the court outlined several factors relevant to assessing whether a defendant acted with reckless indifference to human life, including: whether the defendant used or knew a firearm would be used; the number of weapons involved; the defendant's presence at the scene; any opportunity to prevent harm; the duration and nature of the interaction with the victim; the defendant's knowledge of a confederate's propensity for violence; and efforts, if any, to minimize the risk of violence. (*Clark, supra*, 63 Cal.4th at pp. 618-623; *In re Scoggins* (2020) 9 Cal.5th 667, 677.)

Just as no single factor is dispositive of whether an individual was a major participant in an underlying felony, no single factor dictates whether they acted with reckless indifference to human life. (*Banks, supra*, 61 Cal.4th at p. 803; *Clark, supra*, 63 Cal.4th at p. 618.) With these guiding principles in mind, we turn to the facts of Weathers's case.

The evidence established that Weathers assumed a leadership role in both the planning and execution of the attempted robbery that culminated in McClelland's murder.

She orchestrated the operation from the outset: supplying at least one of the firearms, recruiting three male accomplices to confront McClelland, and facilitating entry into McClelland's condominium. Prior to the shooting, Weathers made it clear that she intended to recover the debt through force if necessary, stating that if McClelland did not pay, she would obtain the money "one way or another," and that the person who owed her "would be taken care of." She added, "I carry a gun in my purse. They will pay." These statements clearly demonstrate that Weathers anticipated the potential for violence—even death—and consciously disregarded that risk in pursuit of collecting the debt McClelland owed to her.

During the confrontation, Weathers directed McGrew to shoot McClelland while McClelland was on his knees. She never attempted to assist McClelland, nor did she indicate any surprise that McGrew had shot McClelland. Rather, Weathers acted as if the killing was part of the plan, even threatening to kill T.M. before fleeing the scene. Given the totality of the evidence, it is difficult to see how it does not establish that Weathers acted with express malice, much less with reckless indifference to human life.

Weathers challenges this conclusion on several grounds, asserting: the "[k]nowing participation in an armed robbery does not by itself establish reckless indifference"; the evidence showing that she commanded McGrew to shoot McClelland was less than clear; she emphasizes that she did not use a gun during the course of the robbery, and that there is no evidence demonstrating that she knew of McGrew's propensity for violence. We find her assertions unpersuasive for several reasons.

First, Weathers's assertion that she merely knowingly participated in an armed robbery minimizes the extent of her involvement in the killing. Weathers did more than simply participate in a " 'garden-variety armed robbery.' " (*Clark, supra,* 63 Cal.4th at p. 617, fn. 74; see *Banks*, *supra*, 61 Cal.4th at p. 809 ["The Supreme Court thus made clear felony murderers … who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life"].)

Indeed, Weathers not only anticipated the use of force but affirmatively intended for McClelland to be killed when she directed McGrew to shoot him.

Second, to the extent that Weathers asserts that the evidence showing she instructed McGrew to shoot McClelland was "not clear cut," we are not persuaded. Although M.A., who had witnessed the murder, was a reluctant witness at Weathers's original criminal trial, T.M. was not.[6] She testified that she recognized Weathers's voice as the one saying, "Fuck you, Paul. You owe me money. Shoot him, shoot him." or "This is because you owe me $1500. Shoot him! Shoot him!"

Third, the prosecutor adduced evidence linking the chrome-colored gun owned by Weathers to be the weapon used by Bell during the robbery, and to the bullets used in the gun that killed McClelland. While the connection between the bullets found in Weathers's purse and the gun used by McGrew was contested at trial, viewing the evidence in the light most favorable to the judgment, as we must (see *People v. Reyes, supra*, 14 Cal.5th at p. 988), a reasonable trier of fact could find that Weathers supplied the firearm used by Bell and the bullets used in McGrew's gun.

Finally, with respect to McGrew's history of violence, the Attorney General concedes that Weathers lacked specific knowledge of her accomplices' violent tendencies. McGrew, for example, had prior convictions for kidnapping and multiple sexual assaults. However, it is unclear if Weathers knew this at the time she recruited him to collect the debt, since McGrew and Weathers had not known each other for very

---

[6] At trial, M.A. denied being present at McClelland's home on the night of the murder. However, the prosecution introduced prior statements made by M.A. to a detective, wherein he described the events of that night. In those statements, M.A. reported being struck just below his right eye with a chrome-plated handgun, hearing Weathers instruct McGrew to shoot McClelland, and witnessing McGrew shoot McClelland in the head. While we disagree with Weathers's characterization of the evidence as ambiguous, we observe that even without M.A.'s prior statements, T.M. independently testified that Weathers had directed McGrew to shoot McClelland.

long. As our Supreme Court has explained, no single factor is necessary or sufficient to establish reckless indifference. (See *Clark, supra,* 63 Cal.4th at pp. 618-623.)

Even assuming Weathers knew nothing of McGrew's violent past, the record plainly demonstrates that she was a major participant in the robbery who acted with reckless indifference to human life. The absence of evidence supporting this factor does not alter our conclusion. We are also unpersuaded by Weathers's remaining claims, including her assertion that her failure to render aid should be treated as a "neutral" factor. Because we have already addressed that conduct as relevant to her mental state, we decline to revisit it here.

## **DISPOSITION**

The trial court's order denying Weathers's petition for resentencing is affirmed.

ELLISON, J.[*]

WE CONCUR:

MEEHAN, Acting P. J.

SNAUFFER, J.

---

[*] Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.